**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**WILLIE OLIVER,**

      **Petitioner,**

**vs.**

                                     **CASE NO. 4:07cv280-SPM/WCS**

**WALTER A. McNEIL,**

      **Respondent.**

                                          /

## REPORT AND RECOMMENDATION

This is a petition for writ of habeas corpus filed by Willie Oliver pursuant to 28 U.S.C. § 2254.  Doc. 1.  Petitioner also filed an amended memorandum in support of his petition.  Doc. 6.  Petitioner challenges his conviction for sexual battery involving force likely to cause serious bodily injury and sentence to life imprisonment in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 2001CF2930A1.  He presents nine grounds for relief.  Doc. 1.

Respondent filed an answer, doc. 19, with the record in paper form, and Petitioner filed a traverse, doc. 20.  Respondent agrees that the petition was timely filed.

Doc. 19, p. 8.  References here are to the exhibits filed as the paper record with to
document 19.

**Summary of the trial evidence**

The trial evidence is summarized by Respondent.  Doc. 19, pp. 1-5.  The offense
took place in 1981.  *Id.*, p. 1.  The trial commenced on June 29, 2004.  The victim, 20
years of age at the time of the offense, was visiting this country from New Zealand.  She
needed to go to New Orleans from Panama City, Florida, to renew her visa, and she
decided to hitchhike, "a common way to travel in New Zealand."  *Id.*, pp. 1-2.

The victim testified that she was picked up by a "black man" in a "white two-door
car," an Oldsmobile.  *Id.*, p. 2.  The driver refused to allow her to leave the car, drove to
a remote place, began striking her, and raped her.  *Id.*  The man then strangled her  into
unconsciousness with a cord.  *Id.*, p. 3.  When she regained consciousness, she had
been severely injured.  *Id.*  Her teeth had been knocked out, she had suffered severe
eye orbit fracture and blow-out fracture of her eye, and her jaw was broken.  *Id.*  A
cinder block with blood on it was found at the scene of the crime.  *Id.*  The crime was
reported and evidence gathered, but evidence identifying the assailant was not available
and the victim returned to New Zealand.  *Id.*

In 1996, Petitioner was serving a prison sentence in the Florida prison system.
*Id.*, p. 4.  The Florida Department of Corrections took a blood sample from him pursuant
to FLA. STAT. § 943.325 (1995) based upon a 1983 judgment that indicated that he had
been convicted of aggravated battery, an offense that qualified for a blood specimen
under that statute.  *Id.*  In fact, however, Petitioner had not been convicted of this
qualifying offense, but only of aggravated assault, and this discrepancy formed the

basis for a motion to suppress at trial.  In 2001, DNA analysis linked Petitioner's blood DNA with DNA taken from semen in the victim's underwear in this case.  *Id.*  "DNA testing revealed a one in 25 quadrillion chance that the semen was from anyone other than Petitioner."  *Id.* (citing Ex. B (trial transcript), pp. 360-366).

The victim testified at trial.  *Id.*, p. 5.  She could not positively identify Petitioner as her assailant, but said that his appearance was consistent with the appearance of her attacker.  *Id.*  Evidence was presented that in 1981, Petitioner owned a white 1976 two door Oldsmobile Toronado.  *Id.*  Petitioner was convicted and sentenced to life imprisonment.

**Section 2254 Standard of Review**

"An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).[1]  But habeas corpus relief may be granted only if Petitioner has properly exhausted his federal claims in state court.  § 2254(b)(1) and (c).  To do so the federal claim be fairly presented to the state court, to give the State the opportunity to pass upon and correct alleged violations of federal rights.  *See* Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004) (citations omitted); Duncan v. Henry, 513 U.S. 364, 365-366, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995).  While it is not necessary that the petitioner cite "book and verse" of the Constitution, the state court must be alerted to the fact that a federal constitutional

---

[1] If no constitutional claims are raised, then §2254 is inapplicable and the exhaustion inquiry is irrelevant.  Engle v. Isaac, 456 U.S. 107, 120, n. 19, 102 S.Ct. 1558, 1567, n. 19, 71 L.Ed.2d 783 (1982).

claim is raised.  Duncan, 513 U.S. at 365-366, 115 S.Ct. at 888 (citations omitted); see also McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005) (holding that a petitioner must "do more than scatter some makeshift needles in the haystack of the state court record") (citations omitted).

The petitioner also "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999); Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (applying this one complete round requirement to state collateral review process as well as direct appeal).  If a claim is not fairly presented through one complete round of state court review and review is no longer available in state court, it is procedurally defaulted and the petitioner must demonstrate cause and prejudice for the default or a miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991).[2]

For a claim fairly presented and adjudicated on the merits in state court, and pursued through one complete round of the review process, Petitioner must show that the state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

_____

[2] The miscarriage of justice exception applies only to extraordinary cases, where a constitutional violation has probably resulted in conviction of an innocent person. McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991). See also House v. Bell, 547 U.S. 518, 536-537, 126 S.Ct. 2064, 2076-2077, 165 L.Ed.2d 1 (2006) (explaining what must be shown to demonstrate actual innocence as a "gateway" to review of a defaulted claim).

States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1) and (2); Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146  L.Ed.2d 389 (2000).  Only adjudication of the merits, not an explanation or written opinion, is necessary for this deference to apply.  Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002) ("all that is required is a rejection of the claim on the merits, not an explanation."); Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 776 (11th Cir. 2003) (same); Herring v. Sec'y for the Dep't of Corr., 397 F.3d 1338, 1347 (11th Cir.), *cert. denied*, 546 U.S. 928 (2005) ("[e]ven a summary, unexplicated rejection of a federal claim qualifies as an adjudication entitled to deference under § 2254(d)." ).  If Petitioner can show that the requirements of § 2254(d)(1) or (2), then this court reviews the federal claim on the merits, without the deference otherwise required.  Panetti v. Quarterman, __ U.S. __, 127 S.Ct. 2842, 2858-59, 168 L.Ed.2d 662 (2007); Jones v. Walker, 496 F.3d 1216, 1228 (11th Cir. 2007) (citing Panetti).

The law governing ineffective assistance of counsel claims was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984).  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520; Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim, "counsel is strongly presumed to have rendered adequate assistance and made all

significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."  Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S. 1204 (2001).  *See also* Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing Chandler).  There are no rigid requirements or absolute duty to investigate a particular defense.  Fugate v. Head, 261 F.3d at 1217.

> Indeed, "[c]onsidering the realities of the courtroom, more is not always better.  Stacking defenses can hurt a case.  Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."

*Id.*

For prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

Although Strickland explained the performance and prejudice prongs of analysis, "there is no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."  466 U.S. at 697, 104 S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

A state court's adjudication of an ineffective assistance claim is not "contrary to" the rule of Strickland as intended by § 2254(d)(1) even if this court might have applied Strickland differently.  Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122 S.Ct. at 1852.  To determine whether the state court's adjudication was an "unreasonable application" of Strickland, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . .  Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  Bell, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* Williams).  "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  Williams v. Taylor, 529 U.S. at 410, 120 S.Ct. at 1522.

**Ground One**

Petitioner contends that his trial attorney was ineffective for failing to object to references to evidence (testimony and photographs of the victim's injuries) of an uncharged criminal offense (attempted murder).  Doc. 1, p. 4.  He argues that the evidence of this uncharged criminal offense "had no relevance to the offense that Petitioner was on trial for, and the evidence may have reasonably help[ed] convict Petitioner."  *Id.*  The gist of this claim is that the evidence that after the sexual assault, Petitioner strangled the victim into unconsciousness and beat her severely with a cinder block, knocking her eye out of the socket and breaking a number of bones in her face, was irrelevant and prejudicial to the offense charged.

As will be explained ahead, the state court twice rejected this claim.  It did so first by denial of a motion for judgment of acquittal and it rejected it by denial of Petitioner's Rule 3.850 motion.  Denying the Rule 3.850 motion, the court said that the evidence of:

> the victim's condition when she was found, her treatment and injuries, and the effect of those injuries on her memory and body, are obviously highly relevant to prosecuting the charge of "sexual battery involving serious physical force" . . . .

Ex. G, p. 24.

The antecedent issue is whether the evidence was essential to prove an element of the crime charged.[3]  If it was, it was relevant and not unfairly prejudicial.

The definition of the elements of a state criminal offense is entirely a question of state law.  Schad v. Arizona, 501 U.S. 624, 636-637, 111 S.Ct. 2491, 2499-2500, 115 L.Ed.2d 555 (1991) (plurality) (Supreme Court is not at liberty to ignore a state law determination that statutory alternatives are means of committing a single crime rather than independent elements under state law); Hall v. Wainwright, 493 F.2d 37, 39 (5th Cir. 1974) (adoption of a single larceny doctrine, that taking several things at the same time is a single crime, is "strictly a matter of state law.").[4]  Cf., Machin v. Wainwright, 758 F.2d 1431, 1435 (11th Cir. 1985), citing, Jackson v. Virginia, 443 U.S. 307, 324 n. 16, 99 S.Ct. 2781, 2792 n. 16, 61 L.Ed.2d 560 (1979) (sufficiency of the evidence is

---

[3] It will be assumed for argument here that it is an element of the offense. Whether an element of the offense or a sentencing factor, it is purely a state law issue, but if relevant for either purpose, this claim will fail.

[4] The Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981, and of Unit B of the former Fifth Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981); Stein v. Reynolds, Inc., 667 F.2d 33, 34 (11th Cir. 1982).

determined "with reference to the substantive elements of the offense as defined by state law." ); Krasnow v. Navarro, 909 F.2d 451, 452 (11th Cir. 1990) (same).

The offense of conviction is defined by FLA. STAT. § 794.011(3) (1981), which provided that Petitioner committed a sexual battery and "in the process thereof" used or threatened to use "actual physical force likely to cause serious personal injury . . . ." Although counsel did not object to the relevance of the evidence during trial, he did move for a judgment of acquittal at the end of the trial making the same arguments in a more fundamental way. Ex. B (trial transcript), p. 470. Counsel argued that the State had not proved an essential element of the offense. He argued that the serious injuries were inflicted upon the victim only after the sexual battery had taken place. Id., p. 471. He argued that the force and injuries were "not used to achieve penetration." Id. He argued that perhaps the force used after the sexual battery was attempted first degree murder, for which the statute of limitations had run, but not proof of a necessary element of the sexual battery offense. Id., pp. 472-473, 476.

Counsel argued that the phrase "in the process of" in FLA. STAT. § 794.011(3) (1981) had a meaning that differs from the robbery statute, which speaks of "forces used in the course of," which is intended to define a robbery that begins as a theft and then, "in the course of" the theft or attempted theft, force is used to commit an escape.[5]

---

[5] In Florida, a "conviction for the crime of robbery requires proof that money or other property was taken from the victim and that the offender used force or violence 'in the course of the taking.' " Messina v. State, 728 So.2d 818, 819 (Fla. 1st DCA 1999). citing, FLA. STAT. § § 812.13(1):

The temporal relationship between the use of force and the taking of the property is addressed in section 812.13(3)(b), which provides that "[a]n act shall be deemed 'in the course of the taking' if it occurs either prior to,

*Id.*, pp. 476-477.  Counsel argued that the Legislature had not "done that here."  *Id.*, p.

477.  He argued that instead, "in the process of" meant only the force used to achieve

penetration.  *Id.*

> The prosecutor argued that the sexual battery was "continuing," that:
>
> He had the opportunity to do whatever – all he had to do was overcome
> the resistence.  So in this particular case because it is a continuing
> offense, he has not reached a point of safety.  He does not reach a point
> of safety until he smashes her and leaves.

*Id.*, p. 478.

> The court rejected Petitioner's argument, finding that the phrase "in the process"

"is a broad term."  *Id.*, p. 479.  The court reasoned:

> And if it has not been interpreted by case law, then I think you just have to
> kind of use your common sense to draw a beginning and end point.
>
> I think the State makes very good points that it would seem non-sensical
> to suddenly draw a line at the moment you've been penetrated once to say
> that then any violence immediately on the heels of that was after and not
> in the process.  When does the process stop?
>
> When did this sexual battery process stop?  The only point we know it
> positively stopped was when she was left alone. . . .

*Id.*, pp. 479-480.  This ruling was raised on direct appeal.  Ex. C, pp. 9, 16-19.  The

appellate court affirmed *per curiam*.  Ex. E.  Thus, the state courts have ruled as a

matter of state law that the offense of conviction can be committed by a violent assault

that occurs immediately following the act of penetration on the particular facts of this

_____

> contemporaneous with, or subsequent to the taking of the property and if it
> and the act of taking constitute a continuous series of acts or events."

*Id.*  Thus, "section 812.13, Florida Statutes incorporates the modern view that a robbery
can be proven by evidence of force used to elude the victim or to retain the victim's
property once it has been taken."  *Id.*

case.  That is the end of the matter.  State courts, not this court, determine the elements

of the offense.  "It is a 'fundamental principle that state courts are the final arbiters of

state law, and federal habeas courts should not second-guess them on such matters.' "

Herring v. Secretary, Dept. of Corrections, 397 F.3d 1338, 1355 (11th Cir.), *cert. denied*,

546 U.S. 948 (2005), *quoting*, Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir.1997)

(citations omitted).[6]

Before leaving this issue, it is noted that this ruling was consistent with Florida

law, although there was and is no case directly on point.  Petitioner was convicted of a

crime of *violence*, sexual *battery*, not simply a sexual crime:

> [T]he sexual battery statute, § 794.011, Fla. Stat. (1981), proscribes a
> crime of violence, not a crime of sex.  *See Aiken v. State*, 390 So. 2d 1186
> (Fla.1980); *Smith*, 401 So. 2d at 1129.[[7]]  Sexual gratification is not an
> element of sexual battery.  " 'Chapter 794 of the Florida Statutes shows a
> clear intent to protect an individual's sexual privacy from violence,' " *Aiken*
> at 1187 (*quoting State v. Aiken*, 370 So. 2d 1184, 1185 (Fla. 4th DCA
> 1979)).  "[A] violation of the sexual battery statute occurs whenever . . .
> there is an intentional, non-consensual intrusion into the sexual privacy of
> another," *Surace v. State*, 378 So. 2d 895, 899 (Fla. 3d DCA), (Schwartz,
> J., specially concurring) (emphasis added), *cert. denied mem.*, 389 So.2d
> 1115 (Fla.1980).

State v. Rider, 449 So. 2d 903 (Fla. 3d DCA), *review denied*, 458 So. 2d 273 (Fla.

1984).  A crime of violence ends when the violence ends.  Petitioner was still "in the

---

[6] "[I]t is not the province of a federal habeas court to reexamine state court
determinations on state law questions.  In conducting habeas review, a federal court is
limited to deciding whether a conviction violated the Constitution, laws, or treaties of the
United States."  McBride v. Sharpe, 25 F.3d at 972, quoting Estelle v. McGuire, 502
U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (citations omitted).

[7] State v. Smith, 401 So. 2d 1126 (Fla. 5th DCA 1981).

process of" a sexual battery when he strangled the victim and beat her face with a

cinder block.

In summary, therefore, Petitioner has not shown ineffective assistance of

counsel.  The evidence was essential to proof of the offense that was charged.

Therefore, it was relevant evidence.  Petitioner has not shown that the state court's

adjudication of this claim "was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United

States," or that the decision "was based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding."  § 2254(d)(1) and (2).

**Ground Two**

Petitioner argues that his attorney was ineffective for failing to move for a mistrial,

object, or seek a curative instruction when the prosecutor improperly appealed to the

sympathy of the jury.  Doc. 1, p. 4.  He asserts that the prosecutor improperly called the

victim to the witness stand and asked her about her family, why she came to the United

States, about her fear of getting into a car with a black male, her pain, and her

permanent disfigurement.  Doc. 8, p. 7.  Respondent agrees that state court remedies

were exhausted as to this claim.  Doc. 19, p. 16.

At trial, the prosecutor established through the testimony of the victim that she

was a citizen of New Zealand, that her older sister came to the United States in

October, 1981, she herself was in nurses' training in New Zealand, her older sister

returned to New Zealand and related what she had seen in the United States, and that it

was common for young people her age to go to England or Europe for an "overseas

experience."  Ex. B, pp. 132-134.  She said: "I was going somewhere.  And America

sounded pretty good."  *Id.*, p. 134.  The victim said that in New Zealand, she often

hitchhiked because this "was a good way to find out local things from local people."  *Id.*,

p. 135.  She explained that she had no concerns for her safety because, although "we

needed to be careful," hitchhiking in New Zealand was "a very common mode of

transport," New Zealand has a lot of tourists, and "backpacking is a way that young

tourists get around."  R. 136.

As noted earlier, the victim was 20 years old at the time.  *Id.*, p. 137.  She heard

of possible employment in the United States.  *Id.*  She sold her possessions and left for

the United States with all of her worldly possessions in her backpack.  *Id.*, p. 139.  She

entered this country on a visa, went to Virginia, but the promised "nanny" job was no

longer available to her.  *Id.*, pp. 139-141.  The husband of the couple for whom she

hoped to work arranged for her to go to Panama City, Florida, to care for his mother.

*Id.*, p. 141.  The victim first tried to hitchhike to Panama City, but then rented a car,

drove to Atlanta, and took a bus.  *Id.*, p. 142.  The work in Panama City began to

diminish; the victim was nearing the three month point and needed to renew her visa in

New Orleans.  *Id.*, p. 144.  She decided to hitchhike to New Orleans.  *Id.*, p. 145.

The victim first got two short rides.  *Id.*, p. 146.  She was "dressed for traveling.  I

had a long-sleeved brown shirt and corduroy bib overalls."  *Id.*  She said that in New

Zealand, road directions are determined by towns rather than road numbers, and she

was not familiar with the roads.  *Id.*, p. 147.

She said that a white two door sedan stopped.  *Id.*, pp. 147-148.  She said: "It

had a chap inside who looked fairly reasonable and said he was heading north."  *Id.*

The following question and answer interchange then took place:

Q      And when this vehicle stopped, the occupant of this vehicle, was this a [C]aucasian male or was this a black male?

A      It was a black man.

Q      Did you have any concerns about getting into a vehicle with a black man?

A      A little.  When I discussed hitchhiking with people along the way –

       MR. POITINGER:    Don't tell us what they said.

       THE WITNESS:      Okay.

BY MR. POITINGER:

Q      Did you yourself have any concern about getting into the vehicle with a black man?

A      A little, but not a lot.

Q      In New Zealand, is there the same type of perhaps negative feeling among races in New Zealand?

A      No, definitely not.

Q      So, in New Zealand, a person of color, is that person treated any differently than anyone else?

A      No.

Q      And you grew up in that type of culture, did you not?

A      Yes, all my life.

Q      So, did you get into the car with this person?

A      Yes, I did.

*Id.*, pp. 149-150.

       The victim testified in detail  on direct about what happened after Petitioner had sex with her against her will, but she did not testify as to suffering pain.  *Id.*, pp. 164-

169.  She testified as to trying to dress after the sex act ended, being choked into unconsciousness, awakening, lying in the dirt and leaves and "all bloody and sticky," walking to a road, being seen by a passing motorist who called the sheriff, being taken to the hospital in an ambulance, undergoing surgery that night, staying in the hospital two weeks, returning to New Zealand with her parents a week after that, and undergoing five additional surgeries over the next two years (plastic surgery, replacement of front teeth).  *Id.*, pp. 164-169.  Plaintiff testified to the permanent damages that she had:  permanent scarring of her face, limited vision in her left eye, and loss of her front teeth.  *Id.*, p. 169.  The damage to the left side of her face was visible to the jury.  *Id.*  There was no redirect examination.  *Id.*, p. 172.

A successful endeavor to render a circumstance understandable will inevitably arouse human sympathy because understanding and sympathy go hand in hand.  It is not impermissible for a prosecutor, through evidence, to render a circumstance understandable.  That is what happened here.  The jurors had no familiarity with the culture of New Zealand in 1981, and the trial was in 2004.  Cultural questions (about hitchhiking mores and race relations in 1981) were entirely proper so that the jury could understand the circumstance that led to this sexual battery.  The state court ruled:

> This evidence was proper and no objection would have been sustained, much less a motion for a mistrial.  While certain phraseology may be subject to criticism, the context of the final arguments of counsel show no mistrial was warranted.

Ex. G, p. 24.  Petitioner has not shown that the state court's adjudication of this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the decision

"was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1) and (2).

**Ground Three**

Petitioner contends that his attorney was ineffective for failing to object to the prosecutor's closing argument, when he urged the jury to "find Mr. Oliver guilty, do the right thing."  Doc. 1, p. 5.  He contends this was objectionable because it was an implied instruction to the jury that it was their "duty to society" to return a guilty verdict.  *Id.*  He argues that this was reversible error, citing <u>Alvarez v. State</u>, 574 So. 2d 1119 (Fla. 3d DCA 1991) and <u>Gomez v. State</u>, 415 So. 2d 822 (Fla. 3d DCA 1982).  Doc. 6, p. 9. Respondent agrees that Petitioner exhausted his state court remedies as to this claim. Doc. 19, p. 19.

At the end of his closing argument, the prosecutor said:

Remember, it is reasonable doubt.  The Judge is going to tell you.  Listen closely.  It is not a possible doubt, which is what if?  Possibility?  That is a possible doubt and is not a legally reasonable doubt.  So all of these ifs that could have happened, it might have happened, look at the evidence you heard.

Did any of those ifs happen?  (Shook head no.)  No.  So the evidence in this case beyond every reasonable doubt is that Willie Oliver is guilty as charged.  And folks, it is your duty to do justice in this case.

Walk back in this courtroom, hold your head up high, and say I did the right thing.  And the right thing in this case is to convict.  Hold him accountable for what he did to [the victim].  Thank you very much for your time and attention.

Ex. B, pp. 535-536.

Petitioner's attorney had objected at three points earlier in the prosecutor's closing argument and was sustained as to each objection. *Id.*, pp. 523, 525, and 526. There was no objection here.

The trial court ruled:

> While this statement [that the jury should do the right thing and convict], taken in isolation, may have resulted in an objection being sustained, there is no way the court would have granted a mistrial. Moreover, in the entire context of the arguments, "doing the right thing" simply means following the jury instructions, that if they find Defendant committed the crime beyond a reasonable doubt, then it is their duty to find Defendant guilty, and it is the state's argument that it has indeed proved the case, so a verdict of guilty is the just decision and duty of the jury. . . . . The prosecutor did not argue a conviction for the general good of society, as argued by Defendant.

Ex. G., p. 24.

Respondent argues that the claim presented, citing <u>Gomez v. State</u>, presents only a state law claim, not a federal claim. Doc. 19, pp. 20-21. Respondent argues that the court rejected this claim as a matter of state law and that ruling was affirmed on appeal, and therefore prejudice for counsel's alleged omission, an essential element of a claim of ineffective assistance of counsel, cannot be shown. *Id.*, p. 21. This is a persuasive argument.

Additionally, the argument by the prosecutor in this case is nothing like the excesses in <u>Gomez</u>. The prosecutor there argued:

> Don't let that gentleman [the victim] with three children and a wife walk away without justice in this case, facing possible jail, an army that's hideously changed the rest of his life and let these gentlemen [the defendant and codefendant] walk away into our community *and commit further crimes of this nature. These assassins must be put away.* It is your duty to do that. You told me you'll do that.

415 So. 2d at 823 (emphasis added).

The argument by the prosecutor in this case is likewise nothing like the excess in Alvarez.  There, *inter alia*, the prosecutor argued:  "This man is guilty.  Don't let them confuse you or insult your intelligence . . . .  Do your part.  *Excise this cancer from society.*"  574 So. 2d at 1121 (emphasis added).  The prosecutor called the defendant a "madman, a violent animal."  *Id.*, at 1120.  The prosecutor said: "I went nuts every time the defense asked . . . ."  *Id.*  The prosecutor told the jury not to "*turn him loose again*," "He is a robber and a burglar, and don't go for anything less . . . .  Can you live with the decision?"  *Id.* (emphasis added).

In summary, Petitioner has not shown that the state court's ruling on this claim was inconsistent with Florida law, and cannot show that it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1) and (2).

**Ground Four**

Petitioner contends his attorney was ineffective for failing to object to another aspect of the prosecutor's closing argument, when he argued that "we would not be here if the Defendant had not committed the crime."  Doc. 1, p. 5.  Petitioner notes that the phrase "we would not be here if" was repeated by the prosecutor more than 25 times.  *Id.*  Petitioner asserts that this argument was improper, citing Buckhann v. State, 356 So. 2d 1327 (Fla. 4th DCA 1978).  Doc. 8, p. 10.  Petitioner asserts that the prosecutor may not imply that the State would not have brought the case unless the defendant was guilty.  *Id.*, p. 11, *citing*, United States v. Garza, 608 F.2d 663 (5th Cir.

1979); Hall v. United States, 419 F.2d 582, 583-584 (5th Cir. 1969); Berger v. United

States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1934); and other cases. *Id.*

Petitioner argues that this phrase takes guilt "as a predetermined fact." *Id.* Respondent

concedes exhaustion of state court remedies with regard to this claim. Doc. 19, p. 22.

     In Buckhann v. State, 356 So. 2d 1327 (Fla. 4th DCA 1978), the prosecutor said:

> *[B]ut don't you think for one second that the State of Florida does not
> believe that Terry Lee Buckhann is guilty, or we would not be here. Don't
> you think for one second that the State of Florida does not believe Sgt.
> Phil McCann*, a fourteen-year veteran with the Broward County Sheriff's
> Office.
>
> *The State of Florida believes him and that is why were are here* and I ask
> you to believe him, because it is one on one situation. (Emphasis
> supplied.)

356 So. 2d at 1328 (emphasis by the court). It is understandable that the court found

this argument to have been improper. *Id.*

     In United States v. Garza, 608 F.2d 663 (5th Cir. 1979), the prosecutor

repeatedly said that the government witnesses were "professionals" and would not lie,

and he argued that he himself thought his witnesses were professional and were

motivated by the desire to "get out and make this world a better place to live in." 608

F.2d at 661-662. The prosecutor concluded: "And, ladies and gentlemen, if I thought

that I had ever framed an innocent man and sent him to the penitentiary, I would quit."

*Id.*, at 662. The court found this to be improper argument because the prosecutor

expressed his personal opinion about the evidence in the case, and on the way to that

impropriety, invoked his status as the government's attorney. *Id.*, p. 663.

     The same is found in Hall v. United States, 419 F.2d 582 (5th Cir. 1969), cited by

Petitioner. There, the prosecutor improperly argued:

> I just don't believe that Harry Degnan who took Beck's statement and
> whom you have seen in this courtroom all this time would force anybody to
> make a statement.  I know him to be a fine F.B.I. officer – absolutely the
> finest I know.  A man of absolute integrity.  And I get a little tired of the
> F.B.I. being whipping boys for hoodlums.  And that is the only way I know
> how to describe the defendant, Donald Hall, he is a hoodlum.

419 F.2d at 585.  The court held this was improper argument.  *Id.*, at 585-586.

Vouching for the credibility of a witness also occurred in United States v.

Lamerson, 457 F.2d 371 (5th Cir. 1972), relied upon by Petitioner.  There, the improper

argument was:  "And, I think Officer McPherson and Agent Stymus [ sic] showed

sincerity.  I firmly believe what they said is the truth. I know it is the truth, and I expect

you do, too."  457 F.2d at 372.  The prosecutor also improperly said: "The Government

is prosecuting Clyde Lamerson in line with what Mr. Koerner [the defense attorney]

says.  And, Mr. Lamerson, had [he] not committed a crime, we would not be doing so.

It's as simple as that."  *Id.*  To like effect is United States v. Brown, 451 F.2d 1231, 1236

(5th Cir. 1971), cited by Petitioner, where the improper comment was that the

prosecutor "personally" thought that the law enforcement witness "did a real good job"

and was "successful, in my opinion."

The state circuit court rejected this claim, presented in the Rule 3.850 motion,

reasoning in relevant part:

> Even if an objection might have been sustained, but no mistrial was
> warranted.  The Defendant argues the state was vouching for its evidence.
> In context, a more reasonable interpretation is the state was simply
> dramatically sequencing the facts in evidence to show they lead to
> Defendant having committed the crime charged, as all shown in this trial.

Ex. G, R. 25.

Respondent argues that this was a "sound" ruling, that "a far more reasonable interpretation is that Petitioner would not be standing trial for sexual battery if the evidence did not overwhelmingly demonstrate his guilt, not merely because the state had chosen to try him."  Doc. 19, pp. 23-24.  Respondent also argues that Petitioner could not demonstrate that a different outcome would have occurred had his lawyer objected since the evidence "overwhelmingly" showed his guilt.  *Id.*, p. 24.  In particular, Respondent cites the DNA evidence and the evidence that in 1981, Petitioner owed a white two-door Oldsmobile.  *Id.*

Context is everything.  The argument at issue here was preceded by a lengthy exposition of the evidence pointing to Petitioner's guilt.  Ex. B, pp. 517-532.  After going over all of the evidence, the prosecutor spoke to the problem of bringing the case 23 years after the crime had been committed.  *Id.*, p. 532.  He said:

> This is what he needs to be held accountable for.  That it's 23 years later, it doesn't make a difference if it is 50 years later.  He needs to be held accountable.  The passage of time does nothing to mitigate what he did or exonerate him for his acts.

*Id.*  It is at this point that the prosecutor began to use the phrase "we would not be here today if."  The argument began with a statement of the obvious:  "We would not be here today if [the victim] had never left New Zealand."  Ex. B, p. 532.  The prosecutor then used that same phrase, "we would not be here," followed by a recitation of a particular evidentiary point that had previously been covered.  *Id.*, pp. 532-533.  The phrase was used eleven times in this portion of the argument.  *Id.*  The ninth use of the phrase was the following: "We would not be here today if he had not sexually battered her."  *Id.*, p. 533.  This is the only use of the phrase directed at a legal conclusion rather than at

some particular aspect of the evidence.  The final two uses of the phrase related to the DNA evidence:

> We would not be here today if those 13 loci found in that semen stain did not match the 13 loci found in his blood.  We would not be here today if an error had been made in the computation or the analysis because you heard the witness say, an error is an exclusion not an inclusion.  Errors exclude.  Even though 12 loci had matched 12 of his, has to be all 13.

*Id.*, p. 533.

The prosecutor's argument, in context, was based upon the evidence and the jury would not have been misled.  It was not an argument that Petitioner was presumed guilty because the State was prosecuting him, or that the prosecutor himself believed the witnesses and evidence.  Petitioner has not shown that the state court's ruling on this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1) and (2).

**Ground Five**

Petitioner contends that his attorney was ineffective for failing to object to the gruesome photographs of the victim's injuries at the time of the offense.  Doc. 1, p. 6. He contends that photographs were so inflammatory that he was denied a fair trial. Doc. 8, p. 13.  He argues that the photographs were relevant only to show the uncharged offense of attempted murder, and were not relevant to show sexual battery. *Id*.  He argues that the photographs unfairly sought the sympathy of the jury.  *Id*. Petitioner cites Young v. State, 234 So. 2d 348 (Fla. 1970); Gomaco Corporation v. Faith, 550 So. 2d 482 (Fla. 1st DCA 1989); and Smith v. State, 344 So. 2d 915 (Fla. 1st

DCA 1977).   Respondent agrees that state court remedies have been exhausted as to

this claim.  Doc. 19, p. 24.

> The state court rejected Petitioner's claim, reasoning that:
>
> The photographs were gruesome only because they documented the
> victim's horrific injuries.  There were highly relevant to prove the crime of
> sexual battery using great physical force.  No objection would have been
> sustained.

Ex. G, R. 25.

> This was a reasonable ruling.  As the Florida Supreme Court has said:
>
> We find that the photographs, which were of the victims' partially
> decomposed bodies, were relevant.  Persons accused of crimes can
> generally expect that any relevant evidence against them will be presented
> in court.  The test of admissibility is relevancy. *Those whose work
> products are murdered human beings should expect to be confronted by
> photographs of their accomplishments.*  The photographs were relevant to
> show the location of the victims' bodies, the amount of time that had
> passed from when the victims were murdered to when their bodies were
> found, and the manner in which they were clothed, bound and gagged.  It
> is not to be presumed that gruesome photographs will so inflame the jury
> that they will find the accused guilty in the absence of evidence of guilt.
> Rather, we presume that jurors are guided by logic and thus are aware
> that pictures of the murdered victims do not alone prove the guilt of the
> accused.  We therefore conclude there was no error in allowing the
> photographs into evidence.

Henderson v. State, 463 So. 2d 196, 200 (Fla. 1985) (emphasis added, citations

omitted).  The federal rule is much the same.  "In general, the introduction of

photographic evidence of a crime victim does not violate a defendant's right to a fair

trial."  Futch v. Dugger, 874 F.2d 1483, 1487 (11th Cir. 1989).

Petitioner relies upon Young v. State, 234 So. 2d 341 (Fla. 1970).  In Young, 22

of 45 photographs showed the badly decomposed torso of the murder victim.  874 So.

2d at 347.  The court found that some of the photographs were relevant, but the "very

number" was the problem:

> The number of inflammatory photographs and resulting effect thereof was
> totally unnecessary to a full and complete presentation of the state's case.
> The same information could have been presented to the jury by use of the
> less offensive photo[g]raphs whenever possible, and by careful selection
> and use of a limited number of the more gruesome ones relevant to the
> issues before the jury.

*Id.*, at 348.

The Young case is not this case.  As explained with respect to Ground One

above, the photographs were directly relevant to prove an element of the offense of

sexual battery sexual battery using actual physical force likely to cause serious personal

injury.  There has been no showing that numerous duplicative photographs were in

evidence.  Accordingly, neither attorney error nor prejudice to the outcome has been

shown.  Thus, Petitioner has not shown that the state court's ruling on this claim "was

contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States," or that the decision "was

based on an unreasonable determination of the facts in light of the evidence presented

in the State court proceeding."  § 2254(d)(1) and (2).

**Ground Six**

Petitioner argues that cumulative error resulted in the deprivation of fair trial and

therefore denied him due process.  Doc. 1, p. 6.  Petitioner presents 28 specific

categories of alleged prosecutorial misconduct.  Doc. 8, p. 16.  He argues that the

errors were compounded by the failure of his counsel to object and obtain a curative

instruction or a mistrial.  Doc. 20, p. 6.

These instances either were alleged in Grounds One through Five, or (for example item 16, "misstated the law,") are insufficiently pled here.  The trial court denied the claim, finding that it had been effectively denied in denial of the earlier claims of ineffective assistance of counsel, and therefore denied the due process claim on the merits.  Ex. G, p. 25.

Respondent argues that Petitioner presented only a state law claim as Ground Six.  Doc. 19, p. 29.  Respondent is incorrect.  Petitioner alleged that the cumulative errors "denied his constitutional due process of law, the right to a fair and impartial trial." Ex. G, p. 21.  Petitioner exhausted his available state court remedies as to this due process claim.

Most of the claimed trial errors concern prosecutorial comments, questioning of witnesses, or argument.  Prosecutorial argument does not constitute reversible error unless such argument renders the trial so fundamentally unfair as to amount to a denial of due process, or unless the statement so prejudices another specific constitutional right, such as the privilege against self-incrimination, as to amount to denial of that specific right.  <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643-645, 94 S.Ct. 1868, 1871-1872, 40 L.Ed.2d 431 (1974).   As reiterated by the Eleventh Circuit:

> To find prosecutorial misconduct, a two-element test must be met:  "'(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant.' "  "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome [of the trial] would be different."  The court makes this determination in the "'context of the entire trial and in light of any curative instruction.' "

<u>United States v. Wilson</u>, 149 F.3d 1298, 1301 (11th Cir. 1998) (citations omitted).

> In determining whether improper argument rises to this level, "we must ask whether there is a 'reasonable probability' that, but for the prosecutor's offending remarks, the outcome of the [guilt or] sentencing [proceeding] would have been different."  "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome."

Kennedy v. Dugger, 933 F.2d 905, 914 (11th Cir. 1991) (citation omitted).

Likewise, an evidentiary ruling of a state court may be a basis for federal habeas corpus relief only if (1) the ruling was erroneous and (2) the error deprived the defendant of a fundamentally fair trial.  Shaw v. Boney, 695 F.2d 528, 530 (11th Cir. 1983) (citing cases).  To establish a violation of fundamental fairness, the evidence erroneously admitted or excluded at trial "must be material in the sense of a crucial, critical, highly significant factor."  Mills v. Singletary, 161 F.3d 1273, 1289 (11th Cir. 1998), *cert. denied*, 124 S.Ct. 804 (2000) (citations omitted).

The trial errors alleged here have all been fully considered with respect to the preceding claims of ineffective assistance of counsel.  Those claims were correctly determined by the state court because neither attorney error nor prejudice to the outcome for failure to object was shown in the Rule 3.850 proceedings.  The lack of prejudice to the outcome determines this claim as well.  Since there was no prejudice to the outcome, there was no denial of a fair trial.[8]  Thus, Petitioner has not shown that the state court's ruling as to the cumulative error due process claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

---

[8] The focus of the prejudice inquiry for an ineffective assistance of counsel claim is on whether the deficient performance renders the proceeding fundamentally unfair or its result unreliable.  Strickland, 466 U.S. at 687, 104 S.Ct. at 2064; *reiterated in* Lockhart v. Fretwell, 506 U.S. 364, 368-369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993).

by the Supreme Court of the United States," or that the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1) and (2).

**Ground Seven**

Petitioner contends that the trial court erred in failing to suppress DNA evidence illegally obtained from Petitioner.  Doc. 1, p. 7.  Petitioner asserts that he was convicted in 1983 of aggravated assault, but the judgment erroneously cited the statute number for an aggravated battery.  *Id.*  He asserts that as a consequence of this error, the Florida Department of Corrections illegally drew blood from him in 1996.  *Id.*  The Department was authorized by FLA. STAT. § 943.325 to draw blood only if he had been convicted of an aggravated battery.  Doc. 8, pp. 19-20.  He contends that the taking of blood violated his Fourth Amendment rights.  *Id.*  The blood sample was eventually typed for DNA, matched with DNA taken from the victim in 1981, and became important evidence leading to Petitioner's conviction.  *Id.*, p. 20.  Respondent concedes that Petitioner's state court remedies were exhausted as to this claim.  Doc. 19, p. 30.

This court generally is "barred from hearing Fourth Amendment claims in a federal habeas corpus proceeding."  Lawhorn v. Allen, 519 F.3d 1272 (11th Cir. 2008), relying on Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Stone held:

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

428 U.S. at 494, 96 S.Ct. at 3052 (footnotes omitted).

> " '[F]ull and fair consideration' in the context of the Fourth Amendment
> includes 'at least one evidentiary hearing in a trial court and the availability
> of meaningful appellate review when there are facts in dispute, and full
> consideration by an appellate court when the facts are not in dispute.' "
> *Bradley v. Nagle*, 212 F.3d 559, 565 (11th Cir.2000) (*quoting Caver*, 577
> F.2d at 1191).[9]  Although "sometimes 'full and fair consideration' means
> consideration by two tiers of state courts[;] sometimes it requires
> consideration by only one."  *O'Berry v. Wainwright*, 546 F.2d 1204, 1213
> (5th Circuit 1977).

Lawhorn, 519 F.3d 1287.  This is true whether or not the accused actually employed

these processes in state court.  519 F.3d at 1288; Huynh v. King,  95 F.3d 1052, 1057

(11th Cir. 1996) (also citing Caver).

Petitioner has not shown that state law failed to provide the opportunity for

meaningful review of this claim in state court, and his claim was reviewed in state court.

Consequently, this court cannot reach the merits of Ground Seven.

**Ground Eight**

Petitioner contends that the violence engaged in with the victim after he had

sexual intercourse with her cannot be used "to enhance the severity of the sexual

battery."  Doc. 1, p. 7.  He argues that the violence was not "in the process" of

committing the sexual battery.  Doc. 6, p. 21.

Respondent contends that this is a state law claim, not a federal claim, and that

Petitioner has not exhausted state court remedies as to any possible federal claim.

Doc. 19, p. 33.  Respondent is correct.  The scope of the state criminal statute (whether

the violence after forced sexual intercourse was an element of the offense, which was

assumed for argument in considering Ground One, or a sentencing factor) is purely a

---

[9] Caver v. State of Ala., 577 F.2d 1188, 1192 (5th Cir.1978).

state law issue.  A violation of a state rule of procedure or of a state law is not itself a

violation of the federal constitution.  *Supra*, n. 6.  *See also*, Engle v. Isaac, 456 U.S.

107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982); Wallace v. Turner, 695 F.2d

545, 548 (11th Cir. 1983) (procedural rule); Branan v. Booth, 861 F.2d 1507, 1508 (11th

Cir. 1989) (sentencing guidelines); Carrizales v. Wainwright, 699 F.2d 1053, 1054-1055

(11th Cir. 1987) (jury instruction).  Though the state court's reading of state law seems

entirely correct as explained above, this court should not reach the merits of this claim.

**Ground Nine**

Petitioner contends that the prosecutor commented on his right to remain silent.

Doc. 1, p. 7.  Respondent argues that state court remedies as to this claim were not

exhausted because Petitioner presented only a state law claim to the state courts,

relying upon Florida law.  Doc. 19, pp. 34-35.  That may or may not be so,[10] and it is

easier for the court to reach the merits to deny the claim.  28 U.S.C. § 2254(b)(2).

The passage in the closing argument at issue here concerns the DNA evidence.

The defense went first, arguing that the DNA testing testimony might not have been

reliable.  He argued that "it is possible for two experts to look at the same genetic profile

---

[10] While not articulated as such, the court seems to have understood that
Petitioner's objection was that the argument touched upon his right to remain silent and
present no evidence.  On direct appeal, Petitioner cited State v. Marshall, 476 So. 2d
150 (Fla. 1985), and argued that the prosecutor had commented upon Petitioner's right
to remain silent. Ex. C, initial brief on appeal, p. 19.  Marshall decided a question
certified as of great public importance, that is:

May the harmless error doctrine be applied to cases in which a prosecutor
has violated a defendant's Fifth Amendment rights under *Griffin v.
California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106?

476 So. 2d 151.  This would seem to have the issue of the federal right to remain silent.

and not be able to agree that it is the same person." Ex. B, p. 508. He argued that with

respect to the panties that had been taken from the victim in 1981 (that contained traces

of semen), "we are not even certain who had it [the panties] at what periods of time for

how long." *Id.* He said:

> We don't know exactly about what controls were used in 1981; we don't
> know exactly how the evidence was treated in 1981; we don't know how
> long it was there. And yet now she [the expert witness] is saying that
> FDLE is infallible. We have controls; things are wonderful.

*Id.*, p. 509. He argued that the FDLE database was wrong, and the FDLE does not use

it. *Id.* He argued that the technicians handling the DNA material at the FDLE were not

being watched, and that contamination could occur. *Id.*, p. 510. He argued that the

panties sat in the Leon County Sheriff's Office from 1999 to 2001. *Id.*, 513. He argued

that the testimony that the experts did not make mistakes was "beyond the realm of

human experience." *Id.*, p. 515. He argued that the two experts who testified were

"agents of law enforcement to close the case for the State of Florida," and that nobody

audits them. *Id.* He pointed out that the reports were incorrect. *Id.*, p. 516.

The prosecutor responded in his closing argument, addressing the State's DNA

evidence. *Id.*, pp. 521-522. He said that he wished that one DNA expert, Josie Roman,

had been more articulate. *Id.*, p. 522. He argued that the jury should decide not on how

she told them that she did her job, but how she actually did her job. *Id.*, p. 523. He

argued that Roman testified that she was able to determine 13 locations (alleles) on the

DNA strand on the sample. *Id.*, p. 524. He argued that the DNA on the panties

produced 13 alleles. *Id.* He argued that a blood sample taken from Petitioner in 2000

produced the same 13 alleles. *Id.* He then said:

> Now, was there cross sample contamination?  Well, the slight problem
> with that is the blood didn't get to the lab until five or six months, whatever
> it was, after the panties had been tested.  *What witness that appeared and
> testified in this courtroom said, I disagreed with Miss Roman's results.
> What witness did you hear say she was wrong.*

*Id.*, p. 525 (emphasis added).  The emphasized words are partially the subject of

Petitioner's claim here.

> Petitioner's attorney objected.  *Id.*  The trial court said:

> Okay.  I'll instruct the jury that that comment is only to be taken as a
> comment on the evidence presented by the State.  There is absolutely no
> duty on the Defense to present anything.  And you've been instructed on
> that, and I will be instructing you again in final instructions.  So you must
> construe it only in that regard, but that special instruction continues.

*Id.*

> The prosecutor followed up by saying:

> Remember, the lawyers are not on trial in this case.  We are not
> witnesses.  The only person that takes issue with that is Mr. Lammers
> [Defense counsel].  And he is not an expert and he is not a witness.  Oh,
> he is articulate.  I wish I had command of the English language that this
> man has.

> He could probably teach but he cannot do.  Josie perhaps was not as
> articulate as she could be.  Perhaps she can't teach that subject but she
> can do.  *Of all the witnesses that you've heard, none said they disagreed.*

*Id.*, pp. 525-526 (emphasis added).  Petitioner's counsel again objected, and the court

said: "All right.  I've already instructed the jury."  The emphasized words are again

partially the subject of this claim.

Earlier, the prosecutor had tried to make the point that he had presented three

DNA experts, Ms. Roman, Karen Barnes Martin, and Suzanne Livingston.[11]  *Id.*, p. 523.

_____

[11] Ex. B, pp. 260-318 (Livingston) and 454-468 (Martin, previously known as
Barnes).

He tried to point out that Petitioner's attorney knew about the testimony of these witnesses, and had a chance before trial to find errors or inconsistencies in their evidence. *Id.* He said:

> Everything that I have, good or bad, those things that help me and those things that hurt me, I have got to disclose to the Defense. Everything. So that counsel has an opportunity when he cross examines a witness to know what those witnesses are going to be saying.
>
> Now, what is significant about that? Well, he [Petitioner's attorney] knew what Josie Roman was going to say. He knew what Karen Barnes (sic) might say. He knew what Suzanne Livingston might say. He knew the results of the examination from the DNA.

*Id.*, P. 523. Petitioner's attorney objected and the objection was sustained. *Id.* The prosecutor said that he had had to "play poker by showing the opposing side my hand." *Id.* Petitioner's attorney objected, asking for an instruction that the Defense has reciprocal obligations under the rule. *Id.* The court sustained the objection, and told the lawyers that it detracted from the case to discuss what process the lawyers use to get to trial. *Id.*, pp. 523-524.

Federal law governing this claim is found in United States v. Chirinos, 112 F.3d 1089 (11th Cir.1997), *cert. denied*, 522 U.S. 1052 (1998). There, the court said:

> To determine whether a prosecutor has impermissibly commented on a defendant's decision not to testify or present a defense, courts must inquire whether the statement "was manifestly intended or was of such character" that the jury would necessarily construe it as a comment on the failure of the accused to testify. *This court will not find that a prosecutor manifestly intended to comment on a defendant's failure to testify if some other explanation for the prosecutor's remark is equally plausible.* "[I]n deciding whether a jury would naturally and necessarily take the statement to be a comment on the defendant's failure to testify, 'the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury *necessarily* would have done so.' "

*Id.* (emphasis added, citations omitted).

In <u>Chirinos</u>, the prosecutor argued in closing:

> Let's look at this house. Remember when [defense counsel] asked Mr. Vargas to draw a map of the house?  You all notice any changes on it indicating anything was wrong?  Did you hear any testimony coming from this box to indicate that a single room was not properly diagramed?
>
>       *        *        *
>
> And the photographs . . . that Mr. Vargas testified to.  Who is the only person who testified to these photographs?  Mr. Vargas said this is the room.  Did you hear anyone come in and say this isn't the room? . . .
>
>       *        *        *
>
> When you hear all of the evidence, remembering what you have heard from the witness stand and recollecting that the assertions made by defense counsel were only by themselves, nothing from the witness stand, and that it was $300,000 [defendants intended to steal], not 300 kilograms of cocaine, you will find that that defense is as phony as this dollar bill.

112 F.3d at 1099.

The Eleventh Circuit concluded that the prosecutor had not improperly commented on the right of the defendant to remain silent.  The court made a distinction between a comment on the right of a defendant to remain silent and the right of a defendant to present evidence.  The court reasoned:

> [T]he argument constitutes a proper comment on appellants' failure to have presented evidence that contradicted the testimony of the government's key witness, Vargas.  *Because it is not improper to comment on the failure of the defense, as opposed to the defendant, to counter or explain the evidence, we find no prosecutorial misconduct.*  We also find that the character of the remarks is not such that the jury would naturally and necessarily construe them as a comment on the failure of the accused to testify.

*Id.*, at 1100 (emphasis added).

The words challenged here are:

> What witness that appeared and testified in this courtroom said, I
> disagreed with Miss Roman's results.  What witness did you hear say she
> was wrong.
>
> Of all the witnesses that you've heard, none said they disagreed.

The prosecutor's comments only related to the expert testimony concerning the

meaning of the DNA testing.  Petitioner undoubtedly had no expertise on that subject.

The jury could not have reasonably expected Petitioner to testify as to the meaning of

the DNA evidence.  Consequently, the jury could not possibly have thought that the

prosecutor's argument was faulting Petitioner for having failed to testify.

Indeed, the words did not even comment upon Petitioner's decision to present no

evidence.  The argument was only intended to emphasize that Roman's DNA evidence

was not contradicted by the testimony of either Barnes or Livingston, despite the cross

examination of those witnesses and the closing arguments of Petitioner.  As a federal

claim, this claim is without merit.

**Conclusion**

Accordingly, it is **RECOMMENDED** that 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Willie Oliver challenging conviction for sexual battery involving force likely to cause serious bodily injury and sentence to life imprisonment in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 2001CF2930A1, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on October 2, 2008.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**